UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                        :
DEBORAH DONOGHUE,                                       :
                                    Plaintiff,          :
                                                        :            13 Civ. 1224 (PAE)
                    -v-                                 :
                                                        :            OPINION & ORDER
DAVID H. MURDOCK and DOLE FOOD COMPANY,                 :
INC.,                                                   :
                                                        :
                                    Defendants.         :
                                                        :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Plaintiff Deborah Donoghue, a security owner of Dole Food Company, Inc. ("Dole"),

brings this complaint in the right and for the benefit of Dole pursuant to § 16(b) of the Securities

Exchange Act of 1934, 15 U.S.C. § 78p(b) ("§ 16(b)"), against defendants David H. Murdock

and, nominally, Dole.  Donoghue alleges that Murdock, a fiduciary of Dole at all relevant times,

realized short-swing profits in violation of § 16(b) when Murdock purchased 4,967,344 shares of

Dole within a six-month window of the Settlement Date—November 1, 2012—of a Forward

Purchase Agreement for Dole common stock entered into in October 2009 by Murdock and an

unrelated third party.  Defendants move to dismiss the Amended Complaint pursuant to Federal

Rule of Civil Procedure 12(b)(6).  For the reasons that follow, defendants' motion to dismiss is

granted.

## I.    Background

### A.    The Parties

      Dole Food Company, Inc. is a Delaware corporation.  First Amended Complaint (Dkt.

16) ("FAC") ¶ 2.  Its common stock was registered under § 12(g) of the Securities Exchange Act

and is traded on the NASDAQ Exchange.  *Id.* ¶ 3.  At all relevant times, Murdock was the chief executive officer of Dole, chairman of its board of directors, and a beneficial owner of more than 10% of its equity.  *Id.* ¶¶ 5, 39.  His shareholdings are owned both directly and indirectly through the David H. Murdock Living Trust, of which Murdock is Trustee and Beneficiary.  *Id.* ¶ 5. Donoghue is a shareholder of Dole.  *Id.* ¶ 2.

**B.      The Forward Purchase Agreement**

On October 22, 2009, Murdock entered into a Forward Purchase Agreement (the "FPA") with the Dole Food Automatic Common Exchange Security Trust (the "Trust").  *Id.* ¶ 11; *see* Declaration of James Worthington in Support of Defendants' Motion to Dismiss (Dkt. 18) ("Worthington Decl."), Ex. A (the "FPA").  Under the FPA, on November 1, 2012 (the "Settlement Date"), Murdock was required to deliver to the Trust up to 24 million shares of Dole common stock or, at Murdock's election, the appropriate cash equivalent, with the exact amount determined by an agreed-upon "Exchange Rate" formula described in the FPA.  FAC ¶¶ 11, 12; *see* FPA § 2.1(c).  On October 28, 2009, Murdock received from the Trust a payment of $227,937,302.77 as compensation.  FAC ¶ 13.  Murdock then delivered his maximum possible obligation under the FPA of 24 million shares to U.S. Bank National Association (the "Collateral Agent"), and authorized the Collateral Agent to deliver those shares to the Trust on his behalf on the Settlement Date.  *Id.* ¶ 14.  Despite the Collateral Agent holding Murdock's shares in escrow, Murdock retained his right to vote those shares and to receive dividends from those shares.  *Id.* ¶¶ 16–17.  Murdock also claimed the sale of those shares—for tax purposes—to have taken place on the Settlement Date.  *Id.* ¶ 18.

The FPA obliged Murdock to deliver on the Settlement Date—in exchange for the prepayment Murdock received on October 28, 2009—a disbursement that would be determined

by a pre-set method: multiplying the 24 million shares held by the Collateral Agent by the "Exchange Rate." *Id.* ¶ 20.  The Exchange Rate was an agreed-upon formula keyed to the "Average Market Price" of Dole stock, which consisted of "the open market prices for shares of common stock of Dole over a period of twenty trading days ending three days prior to but not including the" Settlement Date.  *Id.* ¶ 12.  That formula was defined in the agreement as follows:

> (i)   if the Average Market Price is less than $15.00 (the "Appreciation Threshold Price") but equal to or greater than $12.50 (the "Initial Price"), the Exchange Rate will be a fraction . . . equal to the Initial Price divided by the Average Market Price.
>
> (ii)  if the Average Market Price is equal to or greater than the Appreciation Threshold, the Exchange Rate will be 0.8333; and
>
> (iii) if the Average Market Price is less than the Initial Price, the Exchange Rate will be 1.000.

*Id.* ¶ 21; *see* FPA § 2.1(c).

Put in simpler terms, the FPA contemplated three possibilities.  First, if the Average Market Price for Dole common stock was below the floor price of $12.50, then Murdock was obliged to forfeit all 24 million shares held by the Collateral Agent.  FAC ¶ 23.  Second, if the Average Market Price was at or above the ceiling price of $15.00, then Murdock was obliged to forfeit 24 million shares multiplied by .8333, or approximately 19,999,200 shares.  *Id.* ¶ 24. Third, if the Average Market Price was between $12.50 and $15.00, Murdock was obliged to forfeit a number of shares equal to 24 million multiplied by a ratio set by dividing $12.50 by the Average Market Price.  *Id.* ¶ 25.  Regardless of the Average Market Price, Murdock could opt, at a point 60–90 days before the settlement date, to provide the cash equivalent value of the shares owed and thus retain the shares of Dole held by the Collateral Agent.  *Id.* ¶ 19; *see* FPA § 2.3(d).

On August 31, 2012, Murdock decided to forgo his option of providing cash payment to the Trust and instead deliver on the Settlement Date whatever number of shares the agreed-upon formula would require.  FAC ¶ 34.  On the Settlement Date, the Average Market Price was determined to be $12.866.  Accordingly, pursuant to the formula, the Collateral Agent delivered only 23,317,270 shares to the Trust and returned the remaining 682,730 shares to Murdock.  *Id.* ¶¶ 35, 48.

### C.    Murdock's Other Purchases of Dole Shares

Between July 24, 2012 and August 16, 2012—*i.e.*, within six months of the Settlement Date—Murdock made 17 separate purchases of Dole common stock.  With these, he acquired, completely separate from the FPA, 4,967,344 total shares of Dole.[1]  *Id.* ¶ 36.  Donoghue alleges that during the 16 days on which Murdock purchased Dole stock, the price of Dole common stock rose nearly 30%.  *Id.* ¶ 48.  Donoghue alleges that Murdock profited by an estimated $3,396,107 from his alleged violation of § 16(b).  *Id.* ¶ 37.

### D.    Procedural History

On February 21, 2013, Donoghue filed the original Complaint.  Dkt. 1.  On March 28, 2013, Murdock filed a motion to dismiss, *see* Dkt. 6, in which Dole joined, Dkt. 11.  On April 1, 2013, this Court issued an order stating that Donoghue was required to file an amended complaint, if any, by April 18, 2013.  Dkt. 12.  On April 18, 2013, Donoghue filed the FAC. Dkt. 16.  On May 8, 2013, Murdock filed a motion to dismiss the FAC, *see* Dkt. 19 ("Def Br."), which Dole joined, *see* Dkt. 20.  On May 29, 2013, Donoghue filed a brief in opposition to that motion.  Dkt. 21 ("Pl. Br.").  On June 5, 2013, defendants filed their reply.  Dkt. 23–24.  On July 15, 2013, the Court heard argument.  Dkt. 28 ("Tr.").

---

[1] The FPA prohibited Murdock from purchasing Dole common stock for his own account within 60 days of the Settlement Date.  FPA § 5.1(c).

## II.     Applicable Legal Standard

In resolving a motion to dismiss, the Court must "construe the Complaint liberally, accepting all factual allegations in the Complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." *Galiano v. Fid. Nat'l Title Ins. Co.*, 684 F.3d 309, 311 (2d Cir. 2012). Nevertheless, the "[f]actual allegations must be enough to raise a right of relief above the speculative level," and the complaint must plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [plaintiff's claim]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Put differently, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

## III.    Discussion

### A.     Section 16

Section 16 of the Securities Exchange Act of 1934 "was enacted to prevent corporate insiders from using non-public information to 'speculat[e] in the stock of the corporations to which they owe a fiduciary duty.'" *Donoghue v. Centillium Commc'ns, Inc.*, No. 05 Civ. 4082 (WHP), 2006 WL 775122, at *2 (S.D.N.Y. Mar. 28, 2006) (alteration added) (quoting Senate Comm. on Banking & Currency, Stock Exchange Practices, S. Rep. No. 73-1455, at 68 (1934)). Any beneficial owner of more than 10% of any class of non-exempt equity security, or anyone who is a director or officer of the issuer of any such security, is subject to § 16(b) and the regulations thereunder. 15 U.S.C. § 78p(a); *see Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 320 (2d Cir. 1998).

Section 16(b) states:

> For the purpose of preventing the unfair use of information which
> may have been obtained by such beneficial owner, director, or
> officer by reason of his relationship to the issuer, any profit
> realized by him from any purchase and sale, or any sale and
> purchase, of any equity security of such issuer (other than an
> exempted security) or a security-based swap agreement involving
> any such equity security within any period of less than six months,
> unless such security or security-based swap agreement was
> acquired in good faith in connection with a debt previously
> contracted, shall inure to and be recoverable by the issuer,
> irrespective of any intention on the part of such beneficial owner,
> director, or officer in entering into such transaction of holding the
> security or security-based swap agreement purchased or of not
> repurchasing the security or security-based swap agreement sold
> for a period exceeding six months.

15 U.S.C. § 78p(b).  The statute compels the "disgorgement to the company of any profit derived from the matching of any purchase and any sale of an 'equity security' (other than an exempted security) within a six-month period by a statutory insider." *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998); *see also Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 43 (2d Cir. 2012); *Steel Partners II, L.P. v. Bell Indus., Inc.*, 315 F.3d 120, 123 (2d Cir. 2002); *Magma Power*, 136 F.3d at 320.  Either the issuer of the security or an individual shareholder derivatively can bring a lawsuit under § 16(b).  *Gwozdzinsky*, 156 F.3d at 308.

Section 16(b) functions as a strict liability provision.  It aims "to remove any temptation for insiders to engage in transactions which 'may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information.'"  *Magma Power*, 136 F.3d at 320 (quoting *Kern Cnty. Land Co. v. Occidental Petroleum Corp.*, 411 U. S. 582, 594 (1973)).  Accordingly, "[n]o showing of actual misuse of inside information or of unlawful intent is necessary to compel disgorgement.  Section 16(b) operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition.  Such is the price of easy administration."  *Id.* at 320–21 (citations omitted).  To establish liability, plaintiffs must

prove "that there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period." *Gwozdzinsky*, 156 F.3d at 308.

In this case, it is undisputed that Murdock was a statutory insider and made purchases of Dole securities between July 24, 2012 and August 16, 2012. The only issue is whether he also made a "sale" of Dole securities within six months of that period. The FPA was executed on October 22, 2009, years before Murdock's purchases. Thus, if the *acquisition* of the FPA is the relevant date of sale, Murdock is not liable. The FPA was settled on November 1, 2012, within six months of that period. Thus, if the *settlement* of the FPA is the relevant date of sale, Murdock is liable. Although matching a sale with a purchase under § 16(b) is normally mechanical, as the case law in this area reflects, the use by covered insiders of complex financial instruments such as the FPA complicates the analysis. The regulations and most apposite case law are as follows.

### B. The Application of § 16(b) to Derivative Securities

In 1991, the SEC amended its rules relating to § 16(b) "in order to clear up uncertainties as to how that section applies to derivative securities, including options." *Magma Power*, 136 F.3d at 321; *see Gwozdzinsky*, 156 F.3d at 308. Those amendments reflect the SEC's recognition that "holding derivative securities is functionally equivalent to holding the underlying equity securities for purposes of Section 16." *Magma Power*, 136 F.3d at 321 (quoting Ownership Reports and Trading by Officers, Directors, and Principal Security Holders, Exchange Act Release No. 28,869, [1990-1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 84,709, at 81,258 (Feb. 8, 1991)). These amendments were motivated by the concern that "unless this functional equivalence were recognized and accounted for, insiders could evade disgorgement of short-

swing profits simply by buying call options and selling the underlying stock, or buying underlying stock and buying put options." *Id.* (citation omitted).

The SEC revised Rule 16a-1(c) to define "derivative securities" as: "any option, warrant, convertible security, stock appreciation right, or similar right with an exercise or conversion privilege at a price related to an equity security, or similar securities with a value derived from the value of an equity security." 17 C.F.R § 240.16a-1(c). However, the definition of "derivative securities" explicitly excludes "[r]ights with an exercise or conversion privilege at a price that is not fixed." *Id.* § 240.16a-1(c)(6). Such exempted securities are commonly referred to as "floating price" options. *See Magma Power*, 136 F.3d at 321.

This revised rule treats the date of *acquisition* of a derivative with a conversion privilege at a fixed price as the relevant date for § 16(b) purposes; the date of *settlement* of such an instrument is a non-event. *See id.* at 322; *see* 17 C.F.R § 240.16b-6(b) ("[T]he closing of a derivative security position as a result of its exercise or conversion shall be exempt from the operation of section 16(b) of the Act . . . ."). The logic behind this rule is that an insider who takes an option position with a fixed price conversion privilege is betting on the future movement of the price of the security, and the date of acquisition of the security is the point at which an insider might use inside information to his advantage. By contrast, the date of exercise of the security presents no such danger, because at that point the insider is already bound by the terms of the obligation. *See Magma Power*, 135 F.3d at 322.

Where the insider has an exercise or conversion privilege that is *not* fixed at the time of the acquisition of the security, the analysis flips. At the time of acquisition, the insider does not know the purchase price of the security—hence the term "floating price"; thus, he does not have the ability to lock in short-swing profits at the time of acquisition. That danger is not presented

until the time of settlement, when the exercise price becomes fixed.  Accordingly, where the security has a conversion privilege at a floating price, the date of *settlement* is the relevant date for § 16(b).  *See Tonga Partners*, 684 F.3d at 49.

Complicating matters, some financial instruments contain *both* fixed and floating price components.  As applied to these "hybrid derivatives," § 16(b)'s otherwise straightforward mechanism "has wheels within wheels."  *At Home Corp. v. Cox Commc'ns, Inc.*, 446 F.3d 403, 407 (2d Cir. 2006).  The Second Circuit has instructed that such hybrid derivatives shall be analyzed using a "component analysis."  That is, the court must treat as analytically distinct each option contained in the instrument and consider them in turn.  *See Tonga Partners*, 684 F.3d at 50; *Magma Power*, 136 F.3d at 323–24.

The characterization of a financial instrument as one with a fixed conversion price, a floating conversion price, or a hybrid of the two options depends on the precise terms of the instrument at issue.  The Second Circuit has had several occasions to analyze, and apply § 16(b) to, such complex instruments.  The common thread of these cases is that § 16(b) is aimed prophylactically at preventing insiders, during the six-month statutory window, from engaging in discretionary securities transactions that potentially could be based on inside information.

In *Magma Power*, Dow Chemical Co. ("Dow"), a statutory insider of Magma Power Company ("Magma"), issued exchangeable notes that gave holders the option, any time before maturity, to exchange their notes for a fixed number of shares of Magma—essentially, noteholders had the option to acquire Magma stock for $37.50 per share on the date of their choosing.  *Magma Power*, 136 F.3d at 319.  Between November 21, 1994, and December 29, 1994, many noteholders exercised their option to exchange their notes for Magma shares.  In response to these demands, Dow had the option to either deliver the Magma shares to the

noteholders or to give them the equivalent amount of cash.  Dow chose to deliver the stock to the noteholders.  The Second Circuit faced the question whether Dow's decision to satisfy the exchange demands by delivering stock, rather than cash, was a "sale" that could be matched to Dow's separate September 1994 purchase of Magma stock.  *Id.* at 323.  The Second Circuit concluded that the sale occurred upon the issuance of the notes in 1991, not upon delivery of the shares in 1994.  *Id.* at 324.  It reasoned that Dow did not have an option to sell shares at a floating price, but rather had an option to repurchase the shares that it was obliged to deliver by paying the prevailing market price at the time of the noteholders' demand.  *Id.*  Critically, Dow's hands were tied at the time of the issuance of the shares:  It was up to the *noteholders* to determine when to demand the exchange of shares.  Thus, Dow's option to repurchase shares at the market price—floating though it may have been—did not present a risk of abuse of inside information.  *Id.*  The Court also rejected the plaintiff's characterization of Dow's decision not to exercise its option to satisfy the conversion demands by delivering cash instead of shares as a sale, reasoning that "[a] failure to purchase . . . is not a sale."  *Id.* at 325.

In *At Home*, two statutory insiders of At Home Corporation ("At Home") acquired a put option from American Telephone & Telegraph ("AT&T"), which gave the insiders the option, exercisable at any time between January 1, 2001, and June 4, 2002, to sell shares of At Home stock to AT&T up to a capped aggregate purchase price.  446 F.3d at 405.  The option provided that, whenever the insiders elected to exercise their option, the per share sale price would "be the greater of $48 or the 30-day trading average of At Home shares for the 15 days before and 15 days after exercise of the put."  *Id.*  On January 11, 2001, the insiders exercised their put options, triggering the 30-day trading window that would set the final per-share price.  *Id.* at 406.  At Home's share price during that window fell below $48, so the final per-share price was the $48

fixed price. *Id.* At Home, the plaintiff, argued that the insiders' exercise of their put option was a § 16(b) sale because the eventual price was not "fixed" at the agreement stage. *Id.* at 405. The Second Circuit rejected that argument. It observed that the parties' agreement had both a fixed and floating component: It was fixed to the extent it was executed during a period where the average price settled below $48, yielding a fixed $48 per-share price; it was floating to the extent it was executed during a period where the average price settled above that threshold. *Id.* at 405–06. The insiders exercised their option at the fixed price, making the date of acquisition the relevant date for § 16(b) purposes. *Id.* at 407. Because the floating price aspect of the agreement did not affect the ultimate calculation of the exercise price, the Court had no occasion to consider the ramifications of an option exercised according to a floating price mechanism. *Id.* at 407–08 & n.4.

In *Tonga Partners*, the Second Circuit did have occasion to consider this question. 684 F.3d at 39–40. In June 2004, Tonga Partners, L.P. ("Tonga") acquired a $1.7 million promissory convertible note from Analytical Surveys, Inc. ("ASI"). Tonga had the option to convert the principal of that note into ASI stock at any point before the note reached maturity. The price per share was set by a formula containing both a fixed and floating component.[2] *Id.* at 39. In November 2004, Tonga converted the note into shares of ASI stock, at the applicable floating

---

[2] The formula was:

> the lesser of (1) the lesser of (a)(i) $0.40 if a reverse stock split is not effected prior to conversion or (ii) $2.00 if the reverse stock split is effected prior to conversion, or (b) 90% of the average closing bid price for ASI common stock for the ninety trading days immediately prior to conversion; or (2) 90% of the average closing bid price of ASI common stock for the three trading days with the lowest closing bid price for the twenty trading days immediately prior to conversion.

*Analytical Surveys, Inc. v. Tonga Partners, L.P.*, No. 06 Civ. 2692 (KMW)(RLE), 2008 WL 4443828, at *2 (S.D.N.Y. Sept. 29, 2008), *aff'd*, 684 F.3d 36 (2d Cir. 2012).

price of $1.05 per share, and then sold that stock the following week.  *Id.* at 42.  The Second

Circuit held that Tonga's conversion of the note into shares of ASI stock was a purchase that

could be matched to the subsequent sale.  The court reasoned that the acquisition of such a

hybrid instrument constitutes a § 16(b) purchase of the minimum number of shares that could be

acquired if the exercise were at the fixed price, and that conversion of the instrument at a lower

floating price is a *separate* § 16(b) purchase of any additional shares acquired based on the

difference between the fixed and floating price.  *Id.* at 50–51.  In *Tonga Partners*, the note had a

principal amount of $1.7 million and a fixed price of $2 per share, making the acquisition of the

note a § 16(b) purchase of 850,000 shares.  When the note was converted below the fixed price,

that constituted a separate § 16(b) purchase of 851,341 additional shares obtained by Tonga.  *Id.*

Both the acquisition and conversion were treated as relevant § 16 (b) events, in order to take

account of "an insider's additional opportunity to rely on inside information to time the date of

exercise or conversion, so as to maximize the number of shares obtained above the minimum-

share baseline set at acquisition."  *Id.* at 50.  Because Tonga had the discretion to convert its note

at the date of its choosing, and the instrument included a floating price component, Tonga had

the ability, at either end, to manipulate the transaction to capture short swing profits.[3]

---

[3] *DiLorenzo v. Murphy*, although not dealing with derivative securities, reinforces the point that
acquisition, not settlement, is the relevant date where the insider's obligation is fixed and
irrevocable at acquisition.  443 F.3d 224 (2d Cir. 2006).  There, the defendants entered into an
agreement to sell their businesses to a company named Smithfield in exchange for 10,054,396
shares of Smithfield, with an additional 1 million shares placed in escrow.  *Id.* at 225.
Depending on the results of a subsequent accounting, defendants would either (1) receive some
or all of the shares held in escrow; (2) receive the escrowed shares plus additional shares; or (3)
receive none of the escrowed shares and be required to return some of the 10,054,396 shares they
had received.  *Id.*  The Second Circuit held that the date of the initial agreement was the relevant
date for § 16(b) purposes, not the date the accounting was completed:  "[D]efendants . . .
incurred an irrevocable obligation to acquire Smithfield shares for precise consideration.  While
the defendants did not know on the closing date precisely how many shares of Smithfield stock

In two recent cases, district courts in this District have applied these principles to financial instruments nearly identical to the one presented in this case.  In *Centillium*, Deborah Donoghue, the plaintiff here but acting in that case in her capacity as a shareholder of Centillium Communications, Inc. ("Centillium"), brought a § 16(b) suit against Kamran Elahian ("Elahian"), director of Centillium, who entered into a variable prepaid forward[4] contract with CSFB Cayman International LDC ("CSFB").  2006 WL 775122, at *1.  Under the agreement, Elahian deposited 300,000 shares of Centillium into a trust—to be transferred to CSFB on January 12, 2005—and received $1,593,479.85 in exchange, or $5.3115995 per share.  *Id.*  The conversion formula set forth in the agreement allowed Elahian to retain some of his deposited shares depending on the trading price of Centillium stock a week before the transfer date:  "If the stock price exceeded $6.5173 (the "Floor") on that date, Elahian could withhold from delivery to CSFB the number of shares equal in value to the amount by which the value of the 300,000 shares exceeded $6.5173 per share."  *Id.*  On January 7, 2005, the settlement date, Centillium stock closed well below the floor price, obligating Elahian to deliver all 300,000 deposited shares.  *Id.* at *2.  Donoghue argued that Elahian's delivery of his 300,000 shares constituted a § 16(b) sale—matching his February 28, 2005 purchase of 162,814 shares of Centillium— because "when the Forward was purchased, the number of shares (or cash equivalent) owed at maturity was not fixed."  *Id.* at *4.  The district court disagreed:  Only the *acquisition* of the forward purchase agreement constituted a point of sale for § 16(b), because "Elahian was powerless to manipulate the settlement of the Forward to his advantage.  He was obligated to

_____

they would ultimately receive in exchange for the price they paid, their obligation was fixed."  *Id.* at 229.

[4] Variable prepaid forward contracts can take a variety of forms, but the contracts present in *Centillium* and this case are fairly typical.  *See See* Peter J. Romeo & Alan L. Dye, Section 16 Treatise and Reporting Guide, § 10.05[3][a] (4th ed. 2011).

settle the transaction on January 12, 2005, regardless of whether the stock price was favorable to him on that date." *Id.* at *5. Because the "[d]efendant could only have exploited inside information at the inception of the Forward," the purpose of § 16(b) was furthered by treating the acquisition date, not the settlement date, as the point of sale. *Id.*

*Chechele v. Sperling*, in which a shareholder of Apollo Group, Inc. ("Apollo") alleged that two officers of Apollo (the "Sperlings") violated § 16(b), involved similar forward purchase agreements. No. 11 Civ. 0146 (PAC), 2012 WL 1038653 (S.D.N.Y. Mar. 29, 2012). In return for a fixed aggregate purchase price, the Sperlings agreed to deliver an indeterminate number of shares of Apollo stock to the buyer on a predetermined settlement date. The number of shares to be delivered was set by a pre-determined formula based on the stocks' market price on the settlement date. *Id.* at *1. If the market price of Apollo stock settled below a fixed floor price, the Sperlings would have to deliver the maximum number of shares; if the market price exceeded the ceiling price, or settled between the floor price and the ceiling price, the Sperlings would retain some of the shares they were otherwise obligated to deliver. *Id.* The Sperlings' forward purchase agreements settled between the ceiling and floor price and, therefore, both defendants recovered some of their originally deposited shares. *Id.* at *2. Plaintiff argued that the Sperlings' recovery of some of their originally deposited shares constituted a "purchase" for § 16(b) purposes—matching their subsequent sales on the open market—because the total number of shares owed and thus the per share price was not "fixed" at acquisition. *Id.* The district court disagreed. Adopting the reasoning of *Centillium*, the court held that the only relevant § 16(b) event was the Sperlings' sale of the shares at acquisition of the forward purchase agreement, because "[t]he number of shares to be transferred on the settlement date 'was dictated by financial formulae and criteria set forth in the [Forward agreement],' which the defendant could

not change." *Id.* at \*4 (quoting *Centillium*, 2006 WL 775122 at \*5).  The court reached this conclusion even though there was a "floating" aspect to the pricing formula and, unlike in *Centillium*, the option did settle within that "floating" range.  Treating the date of acquisition, not settlement, as the relevant date furthered § 16(b)'s purpose, the court held, because "the number of shares to be sold on the settlement date depended upon formulas which were set two to three years earlier . . . . The Sperlings had no opportunity to speculate on the basis of their inside information at the time of settlement."  *Id.*[5]

Taken together, these cases emphasize the need to treat SEC Rule 16a-1(c)(6)—which exempts "[r]ights with an *exercise or conversion privilege* at a price that is *not fixed*" from the SEC's definition of derivative securities, *see* 17 C.F.R § 240.16a-1(c) (emphasis added)—as imposing two prerequisites for exemption.  A financial instrument with a component that includes a price that is not fixed, *i.e.*, floating, is not exempt from the definition of derivative securities unless the insider *also* has the privilege—not the fixed, irrevocable obligation—to exercise the instrument at the floating price.  If a financial instrument lacks a fixed settlement price, but will settle on a determinate date at a price to be calculated by a predetermined formula, the insider has no ability to manipulate the settlement of the instrument to his advantage.  On the day he enters the agreement, the die is cast—*alea iacta est*.  The insider's only opportunity to

---

[5] Donoghue critiques both *Centillium* and *Chechele* for what she perceives as their reliance on the "unorthodox" or "borderline" transactions doctrine, *see* Pl. Br. 20–23, which provides a limited exception to § 16(b)'s otherwise categorical prohibition for those transactions that "do not serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information." *Tonga Partners*, 684 F.3d at 45 (citation omitted).  Donoghue is correct that this doctrine is inapplicable unless (1) the transaction by the insider was involuntary, and (2) the insider had no access to inside information.  *Huppe v. WPCS Intern. Inc.*, 670 F.3d 214, 218–19 (2d Cir. 2012); *accord Tonga Partners*, 684 F.3d at 45–46.  Neither *Centillium* nor *Chechele* explicitly invokes this doctrine, but to the extent they rely on its rationale, these decisions are no less correct:  In both cases the defendants' obligations were fixed and irrevocable from the date of acquisition of the forward purchase agreement, and therefore the date of acquisition was the relevant sale date for § 16(b) purposes.

abuse inside information occurs at acquisition, not at settlement. It therefore accords with the

purpose of § 16(b) to treat the date of acquisition as the relevant date where the insider's

obligations are fixed and irrevocable from the date of acquisition, but to treat the settlement date

as the relevant date where the insider has the discretion to convert his option at a price that may

fluctuate depending on the date he chooses to exercise it.[6]

### C.   Application

Application of these principles to this case yields the conclusion that Murdock's sale of

Dole stock occurred, for § 16(b) purposes, on the date of acquisition—October 22, 2009. Under

the terms of the FPA, Murdock's obligations were fixed and irrevocable as of October 22, 2009.

In return for a payment of $227,937,302.77, he delivered 24 million shares of Dole common

stock to a collateral agent. FAC ¶¶ 11, 13. On November 1, 2012, the collateral agent would

release the stock to the third-party Trust pursuant to a fixed formula. *Id.* ¶¶ 20–21. If the

Average Market Price fell below the floor price of $12.50, the collateral agent would deliver all

24 million shares to the Trust; if the Average Market Price settled above the ceiling price of

$15.00, the collateral agent would deliver approximately 19,999,200 shares to the Trust and

return the balance of the shares to Murdock; and if the Average Market Price fell somewhere in

between $12.50 and $15.00, the collateral agent would deliver an amount of shares between

---

[6] In 2001, the SEC expressed its preliminary view that prepaid forward contracts like the one at issue here should be treated as follows: At the time of entering the contract, the insider is deemed to acquire a long put option for the maximum number of shares deliverable under the contract, which is treated as a "sale." Where the insider receives some of the covered shares back because the transaction settled above the floor price, the insider will be deemed to have made a non-exempt purchase of the number of shares retained. *See* Romeo & Dye, *supra*, § 10.05[3][b]. However, the SEC implicitly withdrew this view and substituted a neutral position in its place when it declined to respond to an interpretive request seeking more specific advice on the issue. *See id.* Under the SEC's preliminary view, Murdock would not be liable here, because that view would treat his retention of shares at settlement as a *purchase*, not a sale, and thus would match a purchase with a purchase. A pair of purchases do not subject the purchaser to § 16(b) liability. *See Magma Power*, 136 F.3d at 324.

19,999,200 and 24 million to the Trust and return to balance to Murdock, subject to a formula keyed to the Average Market Price. *Id.* ¶ 21.  Because the Average Market Price of Dole stock fell between the floor and ceiling prices, the collateral agent released 23,317,270 shares to the Trust and returned 682,730 shares to Murdock, reflecting a sale price of $12.866 per share.  *Id.* ¶ 35.  All of this was entirely beyond Murdock's control.  Once he entered into the FPA, Murdock lost any ability to control these events.

Donoghue argues that the FPA was a "hybrid derivative" because it had a "fixed" ceiling price ($15.00), a "fixed" floor price ($12.50), and a "floating" price component (every price in between $15.00 and $12.50).  Donoghue argues that if the transaction had settled below the floor price or above the ceiling, it would have been a non-event for § 16(b) purposes, because both of these components contemplated delivery of a fixed number of shares at a fixed per share price. *See* Pl. Br. 11.  However, Donoghue argues, the transaction here settled within the collar between the floor and ceiling price, making this a "floating" put, for which the relevant date for § 16(b) purposes is the date of settlement.  *See id.* at 11–12.  The Court disagrees.

Although the exact number of shares to be delivered, and hence the per share price, was not yet fixed at the date the FPA was entered into, the formula was.  As of October 22, 2009, the date of settlement and the means of calculating the final per share price were set in stone. Murdock was powerless to change these terms.  He did not have an exercise or conversion *privilege* at a floating price; he had an *obligation* to deliver a number of shares that, albeit unknown at the time he entered into the agreement, was to be determined by a set formula.  This case is therefore like *Magma Power*, in which the defendant had a right to repurchase shares at the floating market price, but, because that right was triggered by the noteholders' demand to exchange shares, not the defendant's choice of when to exercise its option, the defendant had no

floating price conversion privilege and thus no risk of abuse of inside information was presented. *Magma Power*, 136 F.3d at 324; *see Chechele*, 2012 WL 1038653, at *4; *Centillium*, 2006 WL 775122, at *5; *see also DiLorenzo*, 443 F.3d at 229.  And this case is quite unlike *Tonga Partners*, in which defendants had the option to convert their note into stock at the date of their choosing, and therefore could time their exercise of that privilege in order to maximize the number of shares obtained above the fixed minimum set forth in the agreement.  *See Tonga Partners*, 684 F.3d at 50.  Simply put, Murdock had no such privilege.  There was no danger that Murdock would abuse inside information to manipulate the FPA to his advantage at the time of settlement.  Rather, any such danger was presented at the time of Murdock's acquisition of the FPA, when, conceivably, he might have made an offsetting purchase that he knew, based on inside information, would have locked in short-swing profits.  *See Magma Power*, 136 F.3d at 322.  But Murdock did not make any purchases within six months of October 22, 2009.

Murdock did retain one piece of discretion under the FPA:  He had the option, exercisable between 60 and 90 days prior to the Settlement Date, to provide the cash equivalent of the Dole shares to the Trust.  FAC ¶ 19; *see* FPA § 2.3(d).  But Murdock did not exercise that option.  Thus, to the extent Donoghue argues that Murdock's decision not to repurchase the shares, *see* Tr. 31–36, constitutes a "sale," that argument is foreclosed by Second Circuit precedent.  *See Magma Power*, 136 F.3d at 325 ("Dow in fact never exercised its option to buy back the Magma shares.  Magma characterizes the decision by Dow to deliver the shares instead of the cash—*i.e.*, its decision not to exercise its option to repurchase the shares—as a sale.  A failure to purchase, however, is not a sale."); *accord Centillium*, 2006 WL 775122, at *5.

Finally, Donoghue notes that Murdock made an "avalanche" of open market purchases in the months preceding the Settlement Date, and that these purchases drove the Average Market

Price above the floor price, allowing Murdock to retain shares that he would not have retained if the transaction had settled below the floor price. *See* FAC ¶¶ 44–50. Thus, Donoghue argues, the FPA "lent itself to speculative abuse" and Murdock is liable under § 16(b) for his market manipulation. *See* Pl. Br. 18–20. But this argument misperceives the purpose of § 16(b), which is to prevent the speculative abuse of *inside information*. *See* 15 U.S.C. § 78p(b). Murdock's ability to affect the market price of Dole stock through his own purchases was no different than the ability of any individual or entity with sufficient assets to buy a market-moving quantity of stock. That is, the FPA would have been equally subject to "speculative abuse" in the hands of an outsider, who equally could have driven Dole's stock price above the floor. In *Bruh v. Bessemer Venture Partners III LP*, preferred stock held by an insider was converted to common stock subject to a conversion formula which provided that the greater the price of the company's initial public offering ("IPO") relative to the value of the insider's preferred shares, the fewer common shares the insider would receive, and vice versa. 464 F.3d 202, 204 (2d Cir. 2006). The plaintiff argued that the insider could use its inside information to push the price of the IPO artificially downward and thus increase the number of common shares the insider received, but the Second Circuit squarely rejected this argument as a basis for § 16(b) liability: "Whatever advantage [the insider] may have thus gained, however, it was not an *informational* advantage, which, as the statutory text makes clear, was the only type of insider advantage Congress intended § 16(b) to strip away." *Id.* at 214 (emphasis in original).

The same logic applies here. Donoghue does not allege that Murdock's purchases of Dole stock were based on any inside information, and the risk that Murdock could inflate the price of Dole stock through open market purchases to a level favorable to him under the FPA is

not the concern of § 16(b).  *See also Steel Partners*, 315 F.3d at 127 ("Section 16(b) cannot and does not seek to punish all possible abuses by an insider.").[7]

Murdock's purposeful bloating of Dole's stock price through his purchase of nearly 5 million shares conceivably violated some other section of the Securities Exchange Act.  *See generally* Tr. 18–20, 48–50.  But no other claims have been brought in this case.  And the statute at issue here, § 16(b), "operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition."  *Magma Power*, 136 F.3d at 320–21.  Because the FPA did not give Murdock a conversion privilege at a price that is not fixed, it is not exempt from the definition of derivative securities.  *See* 17 C.F.R. § 240.16a-1(c)(6).  Murdock's "sale" of Dole stock therefore occurred at the October 22, 2009 acquisition of the FPA, not at its November 1, 2012 settlement.  *See Magma Power*, 136 F.3d at 322; 17 C.F.R. § 240.16b-6(b).  Murdock made no matching purchase within six months of October 22, 2009, and is therefore not liable under § 16(b).[8]

---

[7] Moreover, Donoghue's argument, when coupled with her assertion that, had the transaction settled above the ceiling price of $15.00, there would be no § 16(b) event subjecting Murdock to liability, *see* Pl. Br. 19, would produce an absurd result:  Murdock would be liable only because he was *unable* to inflate the price of Dole's stock as much as he would have liked.  This logic would reward the most effective insiders while holding liable the less successful cheats.

[8] Alternatively, Donoghue argues that the FPA was a "bona fide pledge" of 24 million shares to the Trust, which should be treated as a § 16(b) sale on the Settlement Date when the Collateral Agent delivered the shares to the Trust.  Such a pledge is generally treated as a non-event for § 16(b) purposes, because there is no change in beneficial ownership of the security.  However, where the pledgee has the right to acquire ownership of the pledged securities upon the occurrence of a material condition—such as the pledgor's default on the secured obligation—the § 16(b) analysis changes.  Two courts in this District have held that a default by a pledgor resulting in the sale or repossession of the pledged stock by the pledgee constitutes a § 16(b) sale by the pledgor.  *See Harrison v. Orleans*, 755 F. Supp. 592, 594 (S.D.N.Y. 1991); *Alloys Unlimited, Inc. v. Gilbert*, 319 F. Supp. 617, 619 (S.D.N.Y. 1970).  These courts reasoned that if the pledgor's default were treated as a non-event, the pledgor could abuse inside information by pledging stock that he knew to have an inflated value; once the stock decreased in value, the pledgor could default on the loan and gain the benefits of the inflated price through receipt of the

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted. The Clerk of Court is directed to terminate the motions pending at docket numbers 6 and 17, and to close this case.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: August 6, 2013
New York, New York

---

loan proceeds. *Harrison*, 755 F. Supp. at 594; *Alloys Unlimited*, 319 F. Supp at 619; *see also* Romeo & Dye, *supra*, § 10.08[4]. Here, no such danger is presented. Murdock's delivery of 24 million Dole shares to the Collateral Agent did not secure a loan, and there was no provision for Murdock to default on his obligations and trigger a § 16(b) sale. Murdock's delivery of shares to the Collateral Agent merely secured the obligation that he had incurred on the acquisition date to deliver as many as 24 million shares to the Trust on the Settlement Date.